**Charles E. SMITH, Appellant,**

**v.**

**John ASH, Merit Ash, Katie A. Smith, aka Katie Ash Smith and Reverend Lawrence Smith, Appellees.**

Court of Appeals of Kentucky.

Oct. 3, 1969.

Robert E. Hogan, Louisville, for appellant.

Howard Snyder, Jeffersonville, Ind., Michael O. McDonald, Martin J. Duffy, Jr., Louisville, for appellees.

CULLEN, Commissioner.

John Ash, Merit Ash and Katie Ash Smith, brothers and sister, each own an undivided one-third interest in a 90-acre island in the Ohio River, in Jefferson County, known as Six Mile Island. On April 5, 1965, Merit and Katie executed a 30-year

lease of the island to Charles E. Smith and William L. Marsh. John did not sign the lease and the lease did not name him as a lessor. In March 1968 Smith, who in the meantime had bought Marsh's interest, brought this action against John, Merit and Katie seeking a declaration that the lease was valid and enforcible. Various defenses were pleaded, including John's plea of the Statute of Frauds. At the close of the plaintiff's evidence the circuit court concluded that the Statute of Frauds made the lease unenforcible as to John and entered judgment dismissing the complaint as to John. That judgment was made final in accordance with CR 54.02. Smith has appealed from the judgment.

Smith's sole contention is that under the evidence produced by Smith, John should have been held estopped to assert the Statute of Frauds. The evidence relied upon was to the effect that John had repeatedly indicated and stated his acquiescence in the lease, in reliance on which Smith had expended large sums of money and a great deal of valuable time in developing the island. In our view of the case it may be accepted as true that John did indicate and state specifically his acquiescence in the lease, and his understanding that Smith had a valid lease, but by reason of the facts hereinafter enumerated there is no equity in Smith's claim of estoppel.

Smith is an experienced businessman, primarily engaged in the concrete business. He owns or controls a tract of land on the shore of the Ohio River, opposite Six Mile Island, which he is developing as a profit-making recreational area. In his conversations with John, Merit and Katie, before the latter two signed the lease, he represented that his primary use of the island would be for a summer camp for underprivileged children. In fact the lease states that the island is "to be occupied by the lessee as a SUMMER CAMP FOR UNDERPRIVILEGED CHILDREN" and that the lessee "agrees to use the property as a base for a SUMMER CAMP FOR UNDERPRIVILEGED CHILDREN." However, Smith's intention was to place a half-million-dollar commercial development on the island, including a marina, and establishments vending food, drink and recreation, from which Smith would draw a salary or commission, and from the ultimate profits of which he would develop a *part* of the island as a camp for underprivileged children. He told John, Merit and Katie that he would have to have some enterprises to raise money for the camp, and the lease recited that the lessee "shall build and maintain various ENTERPRISES to insure the welfare of the UNDERPRIVILEGED CHILDREN OF THIS SUMMER CAMP." However, it is clear that Smith never gave John, Merit and Katie any idea of the magnitude or proportions of the "enterprises" he had in mind and the extent of the area of the island he would devote to those enterprises.

Smith knew, before he obtained the lease from Merit and Katie, that John would not sign a lease because it was his policy never to sign anything. Smith knew also that John owned a one-third interest in the island. Nevertheless Smith proceeded to hire a crane and a bulldozer to start clearing an area for a boat dock and beach, relying, he said, on the statement of Katie's husband, a *preacher*, that the lease was perfectly valid even without John's signature, and relying on John's statements that he thought the lease was a fine thing. The cost of the clearing operations was around $8,000. It appears that the clearing operations were commenced and carried on immediately after the lease was obtained from Merit and Katie. Smith asserts his reliance on many subsequent assertions by John that he approved of the lease but the evidence does not show any expenditure of money by Smith in reliance on those subsequent assurances.

The amount of rent for the lease is stated in the lease document as $1,200 "for said term" and Smith maintains that this means a total of $1200 for the full 30

years, or approximately $3.33 per month. Smith testified that he paid the lessors $100 at the time the lease was signed and had paid nothing since then.

The two Ash brothers are of advanced age and of relatively limited business experience as compared with Smith's. They confined themselves pretty much to their farm where they lived as bachelors.

We recognize the proposition of law that an owner of an interest in land, who has not signed a conveyance complying with the Statute of Frauds, may in some circumstances be estopped from asserting the statute against a vendee who has been led to believe that he has acquired a good title. The usual situation in which estoppel has been applied is where the vendee took a proper conveyance from some vendors, who he thought were all of the owners, whereas there was in fact another owner whose interest was unknown to the vendee and who remained silent when he should have spoken. See McDonald v. Burke, Ky., 288 S.W.2d 363. We recognize also that in some instances an estoppel has been invoked even against a *known* owner, where he surrendered possession and gave assurances that a conveyance would be forthcoming. See Oxley v. Ralston Purina Company, 6 Cir., 349 F.2d 328.

What must not be overlooked, however, is that estoppel is a doctrine of *equity*, to be invoked when equity demands it. As stated in 49 Am.Jur., Statute of Frauds, sec. 581, pp. 888, 889:

" * * * This (estoppel) is based upon the principle established in equity, and applying in every transaction where the statute is invoked, that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in *the perpetration of a fraud,* or

in the *consummation of a fraudulent scheme.* It is called into operation to defeat what would be an *unconscionable* use of the statute, and guards against the utilization of the statute as a means of *defrauding innocent persons* who have been induced or permitted to change their position in reliance upon oral agreements within its operation.

"As has been said, the statute of frauds was designed as a weapon of the *written* law to prevent *fraud,* while the doctrine of estoppel is that of the *unwritten* law to prevent *like evil.* Each is effective in its appropriate field. Both are essential to prevent *wrongs.* * * *" (our emphasis)

Measuring the facts of this case by the foregoing statement of the elements of the doctrine of estoppel, it is clear that there is no basis here for application of the doctrine. John Ash was not engaged in the perpetration of a fraud or the consummation of a fraudulent scheme; there was nothing unconscionable in his conduct; Smith was not an innocent person; John's conduct cannot be characterized as evil. The evidence warrants the conclusions that Smith was experienced; that he was endeavoring to obtain a basis for a profitable commercial venture under the guise of promoting the welfare of underprivileged children, for an outrageously small consideration; and that in rushing workmen and equipment on the land immediately after the lease was signed by Merit and Katie, Smith was not acting in reliance upon assurances that he had a good lease but rather was trying to set up a basis for a claim of estoppel to achieve validation of a lease which he knew was not enforcible against John.

We find no equities in Smith's favor to justify an estoppel.

The judgment is affirmed.

All concur.